## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

SHADE BRADFORD,

                             CASE NO. 3:22-cv-11270

        *Plaintiff*,          DISTRICT ROBERT H. CLELAND

*v.*                      MAGISTRATE JUDGE PATRICIA T. MORRIS

COMMISSIONER OF SOCIAL SECURITY,

        *Defendant*.

_____/

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION ON CROSS-MOTIONS FOR SUMMARY JUDGMENT (ECF Nos. 10, 13)

## I.    RECOMMENDATION

Considering the entire record in this case, I suggest that substantial evidence supports the Commissioner of Social Security's determination that Plaintiff, Shade Bradford, is not disabled. Accordingly, I recommend that the Court **DENY** Plaintiff's motion for summary judgment, (ECF No. 10), **GRANT** the Commissioner's motion, (ECF No. 13), and affirm the decision.

## II.    REPORT

### A.    Introduction and Procedural History

Plaintiff protectively applied for disability insurance benefits ("DIB") and supplemental security income ("SSI") on June 30, 2017, alleging that he became disabled on December 31, 2012. (ECF No. 8, PageID.117, 328–51). The Social

1

Security Administration denied his claims on October 16, 2017. (*Id.* at PageID.139–43). Plaintiff requested a hearing before an ALJ, and an ALJ held hearings in October 2018 and January 2020. (*Id.* at PageID.59–86, 157–58). The ALJ issued a decision on February 5, 2020, finding that Plaintiff was not disabled within the meaning of the Social Security Act. (*Id.* at PageID.117–25). The Appeals Council remanded this decision and the ALJ held a third hearing on February 11, 2021. (*Id.* at PageID.87, 131–35, 267–68). Following this hearing, the ALJ issued a new decision, again finding that Plaintiff was not disabled. (*Id.* at PageID.41).

On June 8, 2022, Plaintiff filed a complaint seeking judicial review of the ALJ's final decision. (ECF No. 1). This case was referred to the undersigned a day later, and both parties later filed cross-motions for summary judgment. (ECF Nos. 3, 10, 13).

### B.    Standard of Review

The district court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g) (2018). The district court's review is restricted solely to determining whether the "Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Sullivan v. Comm'r of Soc. Sec.*, 595 F. App'x 502, 506 (6th Cir. 2014) (internal quotation marks omitted). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant

evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks omitted).

The Court must examine the administrative record as a whole, and may consider any evidence in the record, regardless of whether it has been cited by the ALJ. *See Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989). The Court will not "try the case de novo, nor resolve conflicts in the evidence, nor decide questions of credibility." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Id*. at 286 (internal citations omitted).

## C.   Framework for Disability Determinations

Disability benefits are available only to those with a "disability." *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means the inability

> to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months.

42 U.S.C. § 1382c(a)(3)(A) (2018). The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential

3

analysis:

> (i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled.

> (ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement . . . or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled.

> (iii) At the third step, we also consider the medical severity of your impairment(s). If you have an impairment(s) that meets or equals one of our listings in appendix 1 of this subpart and meets the duration requirement, we will find that you are disabled.

> (iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled.

> (v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. § 404.1520 (2022); *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by [his or] her impairments and the fact that [he or] she is precluded from performing [his or] her past relevant work."

*Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003).  The claimant must provide evidence establishing the residual functional capacity, which "is the most [the claimant] can still do despite [his or her] limitations," and is measured using "all the relevant evidence in [the] case record." 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1) (2022).

The burden transfers to the Commissioner if the analysis reaches the fifth step without a finding that the claimant is not disabled.  *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006).  At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [the claimant] could perform given [his or] her RFC and considering relevant vocational factors." *Rogers*, 486 F.3d at 241 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g) (2022)).

## D.    ALJ Findings

Following the five-step sequential analysis, the ALJ determined that Plaintiff was not disabled.  (ECF No. 8, PageID.52).  At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since December 31, 2012, the alleged onset of disability date.  (*Id.* at PageID.47).  At step two, the ALJ concluded that Plaintiff had the following severe impairments: a history of diabetes mellitus, hypertension and coronary atherosclerosis, obstructive sleep apnea, and "status post Fournier's gangrene that required excisional debridement of left groin and scrotal necrotizing soft tissue area.  (*Id.*)  The ALJ found that Plaintiff's hypogonadism,

dyslipidemia, obesity, bladder cancer, and chronic kidney disease were nonsevere impairments.  (*Id.* at PageID.47–48).  At step three, the ALJ decided that none of Plaintiff's severe impairments met or medically equaled a listed impairment.  (*Id.* at PageIID.48).  Next, the ALJ determined that Plaintiff had a residual functioning capacity to perform medium work with the following limitations:

> he can engage in occasionally lifting up to 50 pounds, frequently lifting up to 20 pounds and continuously lifting up to 10 pounds. He must avoid pulmonary irritants including fumes, gases, noxious odors, mists[,] and poor ventilation, must avoid prolonged exposure to heat, and must avoid vibrations.

(*Id.*)  At step four, the ALJ found that Plaintiff could perform his past relevant work as an office equipment repairer.  (*Id.* at PageID.52).

### E. Background

#### 1. Medical Evidence

Plaintiff alleges that a variety of impairments—including sleep apnea, diabetes, hypertension, gangrene, and chronic kidney disease—prevent him from working.  (*Id.* at PageID.47).

The earliest medical records available show that Plaintiff has had diabetes and hypertension since at least 2014.  (*Id.* at PageID.504, 513).  However, the records show no diabetic complications nor any "long-term insulin use," and his hypertension was "well controlled with medication."  (*Id.* at PageID.49).  Although physicians diagnosed plaintiff with peripheral neuropathy from his diabetes,

examinations consistently made unremarkable findings. (*Id.* at PageID.977). For example, an examination in January 2015 displayed "good results . . . ." (*Id.* at PageID.509, 885). Similarly, a physician noted in February 2017 that Plaintiff had no diabetic complications. (*Id.* at PageID.540). And later that year, one of Plaintiff's physicians also noted that he believed Plaintiff was "noncompliant with management" of his "conditions . . . ." (*Id.* at PageID.50, 828, 849). Specifically, the physician believed that Plaintiff continued to smoke cigarettes and did not monitor his blood sugar, adhere to a diet, or follow an exercise program. (*Id.*)

Sometime that year, Plaintiff developed gangrene in his left groin, which eventually led to "sepsis with mild diabetic ketoacidosis and lactic acidosis." (*Id.* at PageID.528–39). Plaintiff had surgery on his groin in January 2015, which was largely successful. (*Id.* at PageID.912). Indeed, Plaintiff was "volume resuscitated" and his lactic acidosis and ketoacids resolved. (*Id.* at PageID.528–39, 912, 969). After treatment consisting of antibiotics, wound care, and intravenous rehydration, Plaintiff reported that his symptoms had improved, and physicians discharged him in stable condition. (*Id.* at PageID.934, 939).

Plaintiff received treatment for "chronic kidney disease" from 2018 through 2020. (*Id.* at PageID.1135–1234). Doctors noted a "mild acute kidney injury," but Plaintiff consistently displayed stable renal function and his physical examinations were otherwise normal. (*Id.* at PageID.47, 1135–1234). In addition, he showed

stable "creatinine levels" and his symptoms from "hypogonadism" were controlled with testosterone injections. (*Id.*)

## 2. The 2018 and 2020 Hearings

The ALJ began the first hearing by examining Plaintiff. (*Id.* at PageID.62). Plaintiff explained that he became disabled in 2014[1] because of "severe pain in [his] pelvic area" from gangrene. (ECF No. 8, PageID.63–64). Plaintiff described this pain as a "twelve" on a scale of "zero to ten," and testified that he had surgery on his pelvis the following year. (*Id.* at PageID.67; *see also id.* at PageID.64). But Plaintiff continued to have pain even after surgery, and he quit working because of the lingering pain. (*Id.* at PageID.66). Even at the hearing in 2018, Plaintiff still felt persistent pain in his pelvis. (*Id.* at PageID.65).

Around the time he had his surgery, Plaintiff could lift "no more than . . . six to eight pounds." (*Id.* at PageID.67). He could neither sit nor stand for long periods of time, and he spent most of his days "laying on the couch[.]" (*Id.*) He explained that his abilities to sit and stand had not improved much since then, and as of the hearing, he still spent "ninety percent" of his days "on the couch." (*Id.* at PageID.67,

---

[1] Plaintiff's application alleged that his disability began in 2012, and his testimony at the hearing was equivocal as to whether he his gangrene began in 2012 or 2015. (*Id.* at PageID.63–67, 73, 328). However, Plaintiff and his attorney clarified at the 2020 hearing that Plaintiff's gangrene began in 2014 and that he had his surgery in 2015. (*Id.* at PageID.81). This is consistent with the medical evidence in the record (which begins in 2014) and on appeal, Plaintiff concedes that his surgery occurred in 2015, not 2012. (*Id.* at PageID.49; ECF No. 10, PageID.1241).

69–70).  Plaintiff believed that he could sit for no more than ten minutes at one time, that he could stand for no more than fifteen minutes at one time, and that he could not walk the length of one "block."  (*Id.* at PageID.70).

Apart   from   his   chronic   pain,   Plaintiff   testified   that   he   experienced "[t]iredness,  blurred  vision,"  and  frequent  urination  from  diabetes.    (*Id.* at PageID.68).  He also developed "kidney failure" around 2016, which caused "low back pain" and "tiredness."  (*Id.*)  Plaintiff testified that he could dress and bathe himself and perform "light" chores around the house such as washing dishes and countertops.  (*Id.* at PageID.69).  However, his ex-wife would help him with many of these activities.  (*Id.* at PageID.70–71).

The ALJ asked Plaintiff whether he took any medications for his impairments, and Plaintiff testified that he took "about eight" medications at that time.  (*Id.* at PageID.72).  He then asked plaintiff whether he experienced any side effects, and Plaintiff stated that his medications caused "little pains in the back," weakness, and "burning" urine.[2]  (*Id.*)

At the 2020 hearing, Plaintiff testified that his symptoms had not changed since the last hearing, with the exception of his "gangrene," which he believed was

---

[2] It is unclear whether Plaintiff was describing his medication side effects, as the ALJ asked him to, or whether he was describing symptoms of his kidney disease.

"coming back." (*Id.* at PageID.81). Specifically, Plaintiff had "instant pain" whenever he tried to lift his left leg. (*Id.*)

### 3. The 2021 Hearing

The ALJ held a third hearing in 2021, following a remand order from the Appeals Council. Plaintiff told the ALJ that since the last hearing, he had undergone surgery on his bladder after developing cancer. (*Id.* at PageID.90–91). However, Plaintiff had no symptoms besides some "blood" in his urine and "a little dizziness." (*Id.* at PageID.91).

Plaintiff also continued to experience "lower back pains, aching, [and] tiredness" from his kidney disease which began about "four years" earlier. (*Id.* at PageID.91–92). He described his lower back pains as a constant "eight to nine" on a scale of "zero to ten." (*Id.* at PageID.92). He also continued to have "constant" fatigue. (*Id.* at PageID.94).

Plaintiff's ability to sit, stand, and walk had changed little since his 2018 hearing. Specifically, Plaintiff could walk no more than "half" of a "block," stand for no more than ten minutes at once, and sit for no more than twenty minutes continuously. (*Id.* at PageID.95–96).

Shortly before the ALJ ended his examination, Plaintiff testified about the working conditions at his past job as an office equipment repairer. (*Id.* at

PageID.97). He mentioned that he "used to work with toner a lot" and that he would often "inhale" the toner, exacerbating his respiratory issues. (*Id.*)

After Plaintiff testified, the ALJ questioned the vocational expert ("VE"). (*Id.* at PageID.100). The ALJ asked the VE to assume a hypothetical person with the same age, educational level, and prior work experience as Plaintiff who could perform a full range of medium work, except that this person was limited to:

> [o]ccasional lifting up to [fifty] pounds, frequently lifting up to [twenty] pounds, continuously lifting up to ten pounds. Also, avoiding pulmonary irritants such as fumes, dust, fumes [sic], gases, and noxious odors as well a poor ventilation.

(*Id.* at PageID.100–01). The VE opined that the hypothetical person could not perform Plaintiff's past work as a construction worker, but that the individual could perform Plaintiff's past work as an office equipment repairer. (*Id.* at PageID.101). The VE testified further that although officer equipment repairers—both those who perform the job both "as it is generally performed" and as it was actually performed by Plaintiff—would be exposed to airborne toner, Plaintiff could avoid this hazard by wearing "a mask." (*Id.*) The ALJ ended the hearing shortly after and told the VE that he may send her interrogatories if he needed "anything else." (*Id.* at PageID.104).

### 4.     The Vocational Interrogatories

The ALJ eventually sent the VE a set of vocational interrogatories. (*Id.* at PageID.492). In her response, the VE identified two jobs which Plaintiff performed

11

in the past fifteen years: construction worker, Dictionary of Occupational Titles ("DOT") code 869.664-014, heavy work; and office equipment repairer, DOT code 633.281-018, light work. (*Id.*) The VE then addressed the following two hypotheticals set forth in the interrogatories:

> Hypothetical # 1: Assume a hypothetical individual who was born on December 11, 1958, has at least a high school education as defined in 20 CFR 404.1564 and 416.964, and has work experience as described in your response to question 46. Assume further that this individual has the residual functional capacity (RFC) to perform medium work as defined in 20 CFR 404.1567(c) and 416.967(c) except occasionally lifting up to 50 pounds, frequently lifting up to 20 pounds and continuously lifting up to 10 pounds; avoid pulmonary irritants including fumes, gases, noxious odors, mists and poor ventilation; avoid prolonged exposure to heat; and avoid vibrations.
>
> Hypothetical #2: Assume the same limitations as specified above except at the light level of exertion and off task more than 15% of a normal 8-hour workday and/or absent 1-2 days a month on a regular basis due to fatigue and back pain

(*Id.* at PageID.493). In response, the VE opined that the individual in the first hypothetical could perform Plaintiff's prior work as an office equipment repairer, both as it is generally performed and as it was performed by Plaintiff. (*Id.*) However, she believed that this individual could not perform Plaintiff's past work as a construction worker. (*Id.*) She also stated that the individual in the second hypothetical could not perform any of Plaintiff's past work. (*Id.*) She also believed that Plaintiff had no transferable skills. (*Id.* at PageID.494).

One of the interrogatories asked the VE whether her testimony regarding Plaintiff's ability to perform his past work was consistent with the DOT. (*Id.* at PageID.494). The VE responded that her answers were generally consistent with the DOT, but that the DOT did not address either time spent off task or workplace absences, so her answers were "based on [her] knowledge of jobs and employer expectations" rather than the DOT. (*Id.* at PageID.494).

### F. Governing Law

The ALJ must "consider all evidence" in the record when making a disability decision. 42 U.S.C. § 423(d)(5)(B) (2018). The newly promulgated regulations, applicable to applications for disability benefits filed on or after the effective date of March 27, 2017, such as Plaintiff's application here, distinguish between acceptable medical sources, medical sources and nonmedical sources. An acceptable medical source means a medical source who is a:

(1) Licensed physician (medical or osteopathic doctor);

(2) Licensed Psychologist, which includes:

    (i)    A licensed or certified psychologist at the independent practice level; or

    (ii)   A licensed or certified school psychologist, or other licensed or certified individual with another title who performs the same function as a school psychologist in a school setting, for impairments of intellectual disability, learning disabilities, and borderline intellectual functioning only;

(3) Licensed optometrist for impairments of visual disorders, or measurement of visual acuity and visual fields only, depending on the scope of practice in the State in which the optometrist practices;

(4) Licensed podiatrist for impairments of the foot, or foot and ankle only, depending on whether the State in which the podiatrist practices permits the practice of podiatry on the foot only, or on the foot and ankle;

(5) Qualified speech-language pathologist for speech or language impairments only. For this source, qualified means that the speech-language pathologist must be licensed by the State professional licensing agency, or be fully certified by the State education agency in the State in which he or she practices, or hold a Certificate of Clinical Competence in Speech-Language pathology from the American Speech-Language-Hearing Association;

(6) Licensed audiologist for impairments of hearing loss, auditory processing disorders, and balance disorders within the licensed scope of practice only [];

(7) Licensed Advanced Practice Registered Nurse, or other licensed advanced practice nurse with another title, for impairments within his or her licensed scope of practice []; or

(8) Licensed Physician Assistant for impairments within his or her licensed scope of practice [].

20 C.F.R. § 404.1502(a) (2021).

A medical source is "an individual who is licensed as a healthcare worker by a State and working within the scope of practice permitted under State or Federal law, or an individual who is certified by a State as a speech-language pathologist or a school psychologist and acting within the scope of practice permitted under State or Federal law." *Id.* § 404.1502(d).

14

In contrast, a nonmedical source means "a source of evidence who is not a medical source." *Id.* § 404.1502(e). "This includes, but is not limited to: (1) [the claimant]; (2) Educational personnel (for example, school teachers, counselors, early intervention team members, developmental center workers, and daycare center workers); (3) Public and private social welfare agency personnel; and (4) Family members, caregivers, friends, neighbors, employers, and clergy." *Id.*

The Social Security Administration ("SSA") "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical findings, including those from your medical sources." *Id.* § 404.1520c(a). "The most important factors we consider when we evaluate the persuasiveness of medical opinions and prior administrative medical findings are supportability (paragraph (c)(1) of this section) and consistency (paragraph (c)(2) of this section)." *Id.* The SSA will consider several factors when it contemplates "the medical opinion(s) and prior administrative medical findings" in a case. *Id.*

Of these factors, the first is "supportability." This factor considers that "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be[.]" *Id.* § 404.1520c(c)(1).

The SSA will also consider the "consistency" of the claim. This includes the consideration that "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be[.]" *Id.* § 404.1520c(c)(2).

In addition, the SSA will consider the "[r]elationship with claimant[.]" *Id.* § 404.1520c(c)(3). This factor will include the analysis of:

(i)     Length of the treatment relationship. The length of time a medical source has treated you may help demonstrate whether the medical source has a longitudinal understanding of your impairment(s);

(ii)    Frequency of examinations. The frequency of your visits with the medical source may help demonstrate whether the medical source has a longitudinal understanding of your impairment(s);

(iii)   Purpose of the treatment relationship. The purpose for treatment you received from the medical source may help demonstrate the level of knowledge the medical source has of your impairment(s);

(iv)    Extent of the treatment relationship. The kinds and extent of examinations and testing the medical source has performed or ordered from specialists or independent laboratories may help demonstrate the level of knowledge the medical source has of your impairment(s);

(v)     Examining relationship. A medical source may have a better understanding of your impairment(s) if he or she examines you than if the medical source only reviews evidence in your folder[.]

*Id.* The fourth factor of the SSA's analysis is "specialization." In making this determination, the SSA will consider "[t]he medical opinion or prior administrative

16

medical finding of a medical source who has received advanced education and training to become a specialist may be more persuasive about medical issues related to his or her area of specialty than the medical opinion or prior administrative medical finding of a medical source who is not a specialist in the relevant area of specialty." *Id.* § 404.1520c(c)(4).

Finally, the SSA will consider "other factors." These may include any other factors that "tend to support or contradict a medical opinion or prior administrative medical finding." *Id.* § 404.1520c(c)(5). "This includes, but is not limited to, evidence showing a medical source has familiarity with the other evidence in the claim or an understanding of our disability program's policies and evidentiary requirements." *Id.* Further, when the SSA considers "a medical source's familiarity with the other evidence in a claim, we will also consider whether new evidence we receive after the medical evidence source made his or her medical opinion or prior administrative medical finding makes the medical opinion or prior administrative medical finding more or less persuasive." *Id.*

As to the duty to articulate how persuasive the medical opinions and prior administrative medical findings are considered, the new regulations provide "articulation requirements." The ALJ will consider "source-level articulation." Pursuant to this requirement, "[b]ecause many claims have voluminous case records containing many types of evidence from different sources, it is not administratively

feasible for [the ALJ] to articulate in each determination or decision how [he or she] considered all of the factors for all of the medical opinions and prior administrative medical findings in [each] case record." *Id.* § 404.1520c(b)(1).

"Instead, when a medical source provides multiple medical opinion(s) or prior administrative finding(s), [the ALJ] will articulate how [he or she] considered the medical opinions or prior administrative findings from that medical source together in a single analysis using the factors listed in paragraphs (c)(1) through (c)(5) of this section, as appropriate." *Id.* The regulation reiterates that the ALJ is "not required to articulate how [he or she] considered each medical opinion or prior administrative finding from one medical source individually." *Id.*

The regulations stress that the "factors of supportability (paragraph (c)(1) of this section) and consistency (paragraph (c)(2) of this section) are the most important factors we consider when we determine how persuasive we find a medical source's medical opinions or prior administrative medical findings to be." *Id.* § 404.1520c(b)(2). As such, the SSA "will explain how we considered the supportability and consistency factors for a medical source's medical opinions or prior administrative medical findings in your determination or decision. We may, but are not required to, explain how we considered the factors in paragraphs (c)(3) through (c)(5) of this section, as appropriate, when we articulate how we consider medical opinions and prior administrative medical findings in your case record." *Id.*

When medical opinions or prior administrative findings are "equally persuasive," "well-supported" and "consistent with the record" "about the same issue," "but are not exactly the same, [the ALJ] will articulate how [he or she] considered the other most persuasive factors[] for those medical opinions or prior administrative medical findings in [the claimant's] determination or decision." *Id.* § 404.1520c(b)(3).

The regulations clarify that the SSA is "not required to articulate how we considered evidence from non-medical sources using the requirements of paragraphs (a) through (c) of this section." *Id.* § 404.1520c(d).

In addition, the regulations expressly state that the SSA will not consider "evidence that is inherently neither valuable nor persuasive" and "will not provide any analysis about how we considered such evidence in our determination or decision, even under § 404.1520c." *Id.* § 404.1520b(c). The regulations categorize evidence that is inherently neither valuable nor persuasive as: "[d]ecisions by other governmental and nongovernmental entities;" "[d]isability examiner findings," meaning, "[f]indings made by a State agency disability examiner made at a previous level of adjudication about a medical issue, vocational issue, or the ultimate issue about whether you are disabled;" and "[s]tatements on issues reserved to the Commissioner[;]" these statements include:

(i)     Statements that you are or are not disabled, blind, able to work, or able to perform regular or continuing work;

19

(ii)    Statements about whether or not your impairment(s) meets or medically equals any listing in the Listing of Impairments[];

(iii)   Statements about what your residual functional capacity is using our programmatic terms about the functional exertional levels [] instead of descriptions about your functional abilities and limitations[];

(iv)   Statements about whether or not your residual functional capacity prevents you from doing past relevant work[];

(v)   Statements that you do or do not meet the requirements of a medical-vocational rule[]; and

(vi)   Statements about whether or not your disability continues or ends when we conduct a continuing disability review[.]

*Id.* § 404.1520b(c).

The regulations also provide that "[b]ecause a decision by any other governmental and nongovernmental entity about whether you are disabled, blind, employable, or entitled to any benefits is based on its rules, it is not binding on us and is not our decision about whether you are disabled or blind under our rules." *Id.* § 404.1504. Therefore, the Commissioner "will not provide any analysis in our determination or decision about a decision made by any other governmental or nongovernmental entity about whether you are disabled, blind, employable, or entitled to benefits." *Id.* The Commissioner will, however, "consider all of the supporting evidence underlying the other governmental or nongovernmental entity's decision that we receive as evidence in your claim[.]" *Id.*

The regulations clarify that "[o]bjective medical evidence means signs, laboratory findings, or both." *Id.* § 404.1502(f).  Signs are defined as "one or more anatomical, physiological, or psychological abnormalities that can be observed, apart from your statements (symptoms)." *Id.*  Further, "[s]igns must be shown by medically acceptable clinical diagnostic techniques. Psychiatric signs are medically demonstrable phenomena that indicate specific psychological abnormalities, e.g., abnormalities of behavior, mood, thought, memory, orientation, development or perception, and must also be shown by observable facts that can be medically described and evaluated." *Id.* § 404.1502(g).  Laboratory findings "means one or more anatomical, physiological, or psychological phenomena that can be shown by the use of medically acceptable laboratory diagnostic techniques[,]" and "diagnostic techniques include chemical tests (such as blood tests), electrophysiological studies (such as electrocardiograms and electroencephalograms), medical imaging (such as x-rays), and psychological tests." *Id.* § 404.1502(c).

The most recent amendments to the regulations also tweaked the manner in which the SSA evaluates symptoms, including pain.  "In considering whether you are disabled, we will consider all your symptoms, including pain, and the extent to which your symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence.  We will consider all your statements about your symptoms, such as pain, and any description your medical sources or

nonmedical sources may provide about how the symptoms affect your activities of daily living and your ability to work[.]" *Id.* § 404.1529(a).

But the SSA clarified, "however, statements about your pain or other symptoms will not alone establish that you are disabled. There must be objective medical evidence from an acceptable medical source that shows you have a medical impairment(s) which could reasonably be expected to produce the pain or other symptoms alleged and that, when considered with all of the other evidence (including statements about the intensity and persistence about your pain or other symptoms which may reasonably be accepted as consistent with the medical signs and laboratory findings), would lead to a conclusion that you are disabled." *Id.* § 404.1529(a).

Further, "[i]n evaluating the intensity and persistence of your symptoms, including pain, we will consider all of the available evidence, including your medical history, the medical signs and laboratory findings, and statements about how your symptoms affect you." *Id.* § 404.1529(a). The SSA clarified that it will "then determine the extent to which your alleged functional limitations and restrictions due to pain or other symptoms can reasonably be accepted as consistent with the medical signs and laboratory findings and other evidence to decide how your symptoms affect your ability to work." *Id.*

Finally, the SSA noted that "[b]ecause symptoms sometimes suggest a greater severity of impairment than can be shown by objective medical evidence alone, we will carefully consider any other information you may submit about your symptoms." *Id.* § 404.1529(c)(3). This other information may include "[t]he information that your medical sources or nonmedical sources provide about your pain or other symptoms (e.g., what may precipitate or aggravate your symptoms, what medications, treatments or other methods you use to alleviate them, and how the symptoms may affect your pattern of daily living)," which "is also an important indicator of the intensity and persistence of your symptoms." *Id.*

"Because symptoms, such as pain, are subjective and difficult to quantify, any symptom-related functional limitations and restrictions that your medical sources or nonmedical sources report, which can reasonably be accepted as consistent with the objective medical evidence and other evidence, will be taken into account . . . . We will consider all of the evidence presented, including information about your prior work record, your statements about your symptoms, evidence submitted by your medical sources, and observations by our employees and other persons[.]" *Id.* The regulations establish that "[f]actors relevant to your symptoms, such as pain, which we will consider include []:

(i)   [D]aily activities;

(ii)  The location, duration, frequency, and intensity of . . . pain;

(iii)   Precipitating and aggravating factors;

(iv)   The type, dosage, effectiveness, and side effects of any medication . . . taken to alleviate . . . pain or other symptoms;

(v)   Treatment, other than medication, . . . received for relief of . . . pain;

(vi)   Any measures . . . used to relieve . . . pain.

*Id.*

The new regulations also impose a duty on the claimant: "In order to get benefits, you must follow treatment prescribed by your medical source(s) if this treatment is expected to restore your ability to work." *Id.* § 404.1530(a). Stated differently, "[i]f you do not follow the prescribed treatment without a good reason, we will not find you disabled or, if you are already receiving benefits, we will stop paying you benefits." *Id.* § 404.1530(b). Acceptable (or "good") reasons for failure to follow prescribed treatment include:

(1)   The specific medical treatment is contrary to the established teaching and tenets of your religion;

(2)   The prescribed treatment would be cataract surgery for one eye, when there is an impairment of the other eye resulting in a severe loss of vision and is not subject to improvement through treatment;

(3)   Surgery was previously performed with unsuccessful results and the same surgery is again being recommended for the same impairment;

(4)   The treatment because of its magnitude (e.g. open heart surgery), unusual nature (e.g., organ transplant), or other reason is very risky for you; or

24

(5)   The treatment involves amputation of an extremity, or major part of an extremity.

*Id.* § 404.1530(c).

### G. Arguments and Analysis

At Step Four, an ALJ considers whether a claimant can return to his or her prior work—if the claimant can do so, then the he or she is not disabled.  To conclude that a claimant can perform his or her prior work, an ALJ must make two prerequisite findings.  First, the ALJ must craft an RFC that accurately reflects the claimant's functional abilities.  And once the ALJ does so, he or she must then determine the requirements of the claimant's prior work and compare them to the claimant's functional abilities.   20 C.F.R. §§ 404.1520(a)(4)(iv), (f), 404.1560(b).   If the claimant's functional abilities do not prevent him or her from performing his past work, then the claimant is not disabled.

Plaintiff argues that the ALJ did not rely on substantial evidence in finding that he could perform his past work as an office equipment repairer because both prerequisite findings were erroneous.  First, he argues that the ALJ presented the VE with a hypothetical RFC that did not accurately reflect his functional abilities, so the ALJ could not reasonably rely on the VE's conclusion that Plaintiff could perform his past work.  And second, Plaintiff argues that even if the ALJ presented the VE with an accurate hypothetical, the VE's testimony was both internally inconsistent and inconsistent with the DOT, so it did not accurately reflect the requirements of

25

his past work.

###    1.    Whether Substantial Evidence Supports the ALJ's RFC Finding

Plaintiff argues that the ALJ's RFC finding was both factually incorrect and legally erroneous.   On the facts, Plaintiff argues that the ALJ did not rely on substantial evidence when he rejected Plaintiff's allegations of pain and fatigue. And on the law, Plaintiff argues that the ALJ erred by failing to discuss the side effects of his medications.

###    a.    Pain and Fatigue

At the hearings, Plaintiff testified that his pain and fatigue reduced his ability to sit, stand, and walk.  Specifically, he claimed that he could walk no farther than "half a block," and he testified that he could sit for only thirty minutes and stand for only ten minutes.  (ECF No. 8, PageID.95–96).  The ALJ, however, discounted Plaintiff's subjective complaints and found that Plaintiff could stand, sit, and walk well enough to perform medium work.  (*Id.* at PageID.48).  *See generally* SSR 83-10, 1983 WL 31251, at *6 (Jan. 1, 1983).

Plaintiff argues that the ALJ did not rely on substantial evidence in rejecting his subjective complaints and that the ALJ should have found an RFC that accounted for his limited ability to stand, sit, and walk.  (ECF No. 10, PageID.1254–57). Specifically, Plaintiff asserts that it was unreasonable for the ALJ to discount his subjective complaints because he received "limited and unremarkable" treatment.

26

(*Id.*; *see also* ECF No. 14, PageID.1291).

The claimant carries the burden of proving his RFC, and generally, ALJs need not "accept a [claimant's] subjective complaints as support for a more restrictive RFC." *Jones v. Comm'r of Soc. Sec.*, No. 20-11851, 2021 WL 4205061, at *3–4 (E.D. Mich. June 30, 2021), *report & recommendation adopted by Jones v. Comm'r of Soc. Sec.*, 2021 WL 4205061 (E.D. Mich. Aug. 17, 2021); s*ee also Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 475 (6th Cir. 2003).  Indeed, once the ALJ finds that the claimant's "medical impairment(s) . . . could reasonably be expected to produce" the claimant's alleged symptoms (which the ALJ did here), the ALJ must then "determine the extent to which [the claimant's] alleged functional limitations and restrictions due to pain or other symptoms can reasonably be accepted as consistent with the medical signs and laboratory findings and other evidence to decide how [the claimant's] symptoms affect [his or her] ability to work . . . ."  20 C.F.R. §§ 404.1529(a), 416.929(a) (2022).  And in doing so, the ALJ may consider any relevant factor, including medical opinions, medication, treatment, and "[a]ny measures" the claimant has used to relieve his or her symptoms.  *Id.* §§ 404.1529(c), 416.929(c).

However, the Administration recognizes that symptoms, like "pain" and fatigue, "are subjective and difficult to quantify."  *Id.*  §§ 404.1529(c)(3), 416.929(c)(3).  And for that reason, the Regulations prohibit ALJs from discounting

a claimant's testimony about his or her symptoms simply because "the available objective medical evidence does not substantiate [the claimant's] statements." *Id.* §§ 404.1529(c)(2), 416.929(c)(2).   So while the ALJ may discount a claimant's subjective complaints upon finding that they contradict other evidence in the record, an ALJ may not discount a claimant's subjective complaints simply because they lack support. *Id.* §§ 404.1529(c)(2)–(3), 416.929(c)(2)–(3).

Here, the ALJ reasonably discounted Plaintiff's subjective complaints because they contradicted other evidence in the record.   Most notably, the ALJ reasoned that Plaintiff's "limited" treatment for his physical conditions undermined his assertion that these impairments caused him so much pain and fatigue that he could not walk, stand, or sit without limitation.   (ECF No. 8, PageID.122).   Specifically, the ALJ recognized that Plaintiff "received limited treatment for his physical conditions, which were stable and without complication." (*Id.* at PageID.47, 50).   Plaintiff also "did not require emergency room presentation, hospitalization, or surgical intervention since" his application date.   (*Id.* at PageID.50).   And not only did Plaintiff receive limited treatment, but he apparently made little effort to follow his recommended treatments.   Indeed, one of Plaintiff's physicians believed that Plaintiff was "noncompliant" with treatment for his diabetes, because Plaintiff did not "monitor his blood sugar," adhere "to his diet," or follow "a formal exercise program." (*Id.* at PageID.50, 828, 849).   A medical consultant concurred that

Plaintiff's "compliance" with his diabetes treatment "suboptimal" based on her review of the medical record. (*Id.* at PageID.1085). Noticing a trend, the ALJ also mentioned that Plaintiff's physicians took away his CPAP machine "due to low compliance." (*Id.* at PageID.50, 893).

Plaintiff appears to suggest that by citing his "limited" treatment, the ALJ faulted him for failing to provide objective evidence in support of his allegations. But that is not so. Courts consistently recognize that a claimant's modest treatment is a valid consideration when evaluating a claimant's RFC. *E.g.*, *Engle v. Saul*, No. 20-10403, 2021 WL 850565, *8–9 (E.D. Mich. Feb. 16, 2021); *Gregson v. Comm'r of Soc. Sec.*, No. 17-cv-13600, 2019 WL 1253473, at *5 (E.D. Mich. Jan. 2, 2019); *Runk v. Comm'r of Soc. Sec.*, No. 09-12893, 2010 WL 3905241, at *3 (E.D. Mich. Sept. 30, 2010). That is because claimants with severe symptoms would generally be expected to seek out, receive, and follow correspondingly significant treatment. *See Engle*, 2021 WL 850565, at *9. So rather than discounting Plaintiff's testimony simply because the record—showing mostly conservative treatment and repeated failure to comply with medical advice—stood at odds with the alleged severity of Plaintiff's symptoms. *Cf. id.*; *Little v. Comm'r of Soc. Sec.*, No. 4:16-cv-11968, 2017 WL 9471679, at *7 (E.D. Mich. Aug. 14, 2017) (recognizing that ALJ's can rely on "noncompliance and conservative treatment" to "discount" a claimant's "credibility"), *report & recommendation adopted by Little v. Comm'r of Soc. Sec.*,

2017 WL 4276968 (E.D. Mich. Sept. 27, 2017).  Accordingly, Plaintiff's modest treatment and "suboptimal" compliance were both valid and reasonable considerations.

In addition to Plaintiff's conservative treatment, the ALJ identified other evidence which contradicts Plaintiff's subjective complaints.  For example, the ALJ noted that Plaintiff's diabetes, kidney disease, and "status" following his gangrene surgery, the three impairments to which Plaintiff attributed his pain and fatigue, caused only mild symptoms.  Specifically, the ALJ cited an examination focused on Plaintiff's diabetes from January 2015 which found "good results with no retinopathy."  (ECF No. 8, PageID.50, 509, 885).  Similarly, a diabetic examination performed two years later noted that Plaintiff had no complications from his diabetes.  (*Id.* at PageID.846).  As for Plaintiff's kidney disease, the ALJ noted that reports from 2018 through 2020 were "largely normal" and indicated "stable renal function."  (*Id.* at PageID.47, 1135–1234).  And as for Plaintiff's allegedly lingering pain following his gangrene surgery, although Plaintiff complained of chronic pain at the 2018 and 2020 hearings, the ALJ accurately noted that Plaintiff's surgery on his groin was successful and that he "reported" to his physician that his symptoms improved."  (*Id.* at PageID.49–50, 939).  And again, the ALJ reasonably found it significant that Plaintiff did not pursue treatment for his ongoing pain after his surgery in 2015.  Plaintiff also "consistently" displayed normal strength and gait,"

and both consulting physicians noted that Plaintiff exhibited little to no signs of neuropathy. (*Id.* at PageID.1085–86, 1111). Taken together, this evidence suggested that Plaintiff's impairments were not as significant as he alleged, and therefore unlikely to cause severe pain or fatigue.

Moreover, the ALJ's conclusion that plaintiff could perform medium work without additional restrictions on his ability to walk, stand, or sit was consistent with the opinion of Dr. Campbell, one of the two consulting physicians. (*Compare id.* at PageID.1105–07, *with* SSR 83-10, 1983 WL 31251, at *6 ("A full range of medium work requires standing or walking, off and on, for a total of approximately 6 hours in an 8-hour workday . . . .")). True, the other consulting physician, Dr. Eiler, found that Plaintiff could neither stand nor walk for more than one hour continuously, or for more than eight hours total in a single day, but the ALJ reasoned that her opinion was "internally" unsupported and inconsistent with the record as a whole. (ECF No. 8, PageID.51, 1079, 1085–86). And while Plaintiff argues that the ALJ should have adopted Dr. Eiler's opinion, he does not explain why the ALJ's findings regarding the supportability and consistency of Dr. Eiler's opinion were not supported by substantial evidence. *See McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1989) ("It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones."). At most, Plaintiff simply identifies substantial evidence in support of greater limitations, but an ALJ's

decision "must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (citations omitted).

### b.     Medication Side Effects

Separately, Plaintiff argues that the ALJ's RFC finding is legally deficient because he did not discuss whether Plaintiff experienced any side effects from his medications.  In Plaintiff's view, the regulations require ALJs to discuss all of a claimant's medications and their side effects.  (*See* ECF No. 10, PageID.1257–58). So because the ALJ here "never discusse[d]" Plaintiff's "medications . . . or their side effects," the Court must remand the matter so that the ALJ can clearly articulate how these factors affected his RFC finding.  (*Id.*)

Plaintiff misreads the regulations.  Under 42 U.S.C. § 423(d)(5)(B), an ALJ must consider a claimant's entire medical record before rendering a decision.  *See also* 20 C.F.R. § 404.1520(a)(3) (2021); Carolyn A, Kubitschek & Jon C. Dubin, Social Security Disability Law and Procedure in Federal Court § 6:20 (2019) ("It should be fairly obvious that the ALJ must evaluate all of the evidence, and may not disregard any of the relevant evidence.").  This does not mean, however, that an ALJ's written decision must mention every piece of evidence in the record. *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) (quoting

*Loral Defense Systems–Akron v. NLRB*, 200 F.3d 436, 453 (6th Cir. 1999)).  Indeed, an ALJ need not discuss evidence that clearly would not impact his or her decision. *See id.*; *Abbott v. Sullivan*, 905 F.2d 918, 925 (6th Cir.1990).  Rather, an ALJ need only articulate his or her reasoning well enough to allow a reviewing court to understand the basis for his or her decision.  *See Bailey v. Comm'r of Soc. Sec.*, No. 98-3061, 1999 WL 96920, at *3–4 (6th Cir. 1999) (quoting *Hurst v. Sec'y of Health & Human Servs.*, 753 F.2d 517, 519 (6th Cir.1985)).

The same rules apply when an ALJ considers a claimant's use of medication and the possibility of any side effects.  Under 20 C.F.R. § 416.929(c)(3)(iv), ALJs may consider the "type, dosage, effectiveness, and side effects of any medication" a claimant takes when evaluating the "severity of" a claimant's "impairment."  But the regulation does not *require* ALJs to discuss a claimant's medications and their possible side effects in every written decision—it simply lists medications as one relevant "factor[]" for an ALJ to consider when evaluating the effect of a claimant's impairment on his or her RFC.  *French v. Comm'r of Soc. Sec.*, No. 15-12687, 2016 WL 3951419, at *13 (E.D. Mich. June 30, 2016), *report & recommendation adopted by French v. Comm'r of Soc. Sec.*, 2016 WL 3924111 (E.D. Mich. Jul. 21, 2016).  So under *Kornecky* and *Abbott*, ALJs need only discuss the possibility of side effects if the record contains "evidence" supporting "the alleged side effects."  *Lorenz v. Berryhill*, No. 18-13793, 2020 WL 1818047, at *6–7 (E.D. Mich. Jan. 24, 2020).

33

Moreover, the mere fact that a claimant takes a medication which could potentially cause side effects says little about whether the claimant actually experienced any side effects, so ALJs need not discuss the possibility of side effects whenever a claimant establishes that he or she takes medication. Take *Isaac v. Commissioner of Social Security*, for example. 12-CV-13324, 2013 WL 4042617 (E.D. Mich. Aug. 9, 2013). There, an ALJ neglected to discuss the "potential side effects" of his medications even though his medications were known to "cause fatigue" and the claimant testified to sleeping sixteen hours per day. *Id.* at *15. Even so, this Court held that the ALJ did not err by failing to discuss the possibility of side effects because the claimant "never complained about a side effect to his doctors" and his medical record contained no evidence of side effects. *Id.* The Court explained that any "potential side effects of a claimant's medications are not relevant absent some indication that the claimant actually suffers those side effects." *Id.*; *see also Lorenz*, 2020 WL 1818047, at *6–7.

Here, the ALJ satisfied his initial duty to at least "consider" Plaintiff's use of medication and any possible side effects. *See* 42 U.S.C. § 423(d)(5)(B). Indeed, the ALJ received an exhaustive list of Plaintiff's prescriptions, discussed these medications and their side effects at Plaintiff's hearings, and explicitly acknowledged Plaintiff's use of medication throughout his decision. (ECF No. 8, PageID.47–51, 72, 92, 455).

Nor did the ALJ err by declining to discuss the potential side effects of Plaintiff's medications in his decision. Plaintiff lists several of his prescriptions and suggests that his mere use of these medications obligated the ALJ to discuss the possibility of side effects. (*See* ECF No. 8, PageID.1257–58). But that is not so— where the record contains "indication that the claimant actually" experienced side effects, a reviewing court can understand how the ALJ found that the claimant did not have any side effects, even without a written discussion. *Isaac*, 2013 WL 4042617, at *15. So Plaintiff's use of medication, alone, did not require the ALJ to discuss the possibility of side effects.

Plaintiff, does, however, attempt to point out some circumstantial evidence that his medications caused side effects. He notes that "many" of his prescriptions "are known" to cause "fatigue and tiredness"—symptoms which he has "continuously reported." (ECF No. 13, PageID.1257). So the ALJ, Plaintiff argues, should have inferred that his medications caused these symptoms. (*See id.*)

Under the Commissioner's reading of *Lorenz* and *Isaac*, Plaintiff's failure to identify any objective, medical evidence of side effects relieved the ALJ of his duty to discuss side effects in his decision. *See Lorenz*, 2020 WL 1818047, at *6–7; *Isaac*, 2013 WL 4042617, at *15. The Commissioner is correct that Plaintiff fails to cite any direct, medical evidence indicating he suffered from side effects. And the Commissioner is also correct that generally, a party's failure to cite "objective

medical evidence" of an "alleged side effect[]" relieves the ALJ of his or her duty to discuss the potential side effect in the written decision. *Lorenz*, 2020 WL 1818047, at *6–7.  But this sweeping proposition paints with too wide of a brush.  Indeed, there may circumstances where a discussion of potential side effects may be necessary to enable "meaningful" judicial review, even without any objective, medical evidence. *Bailey*, 1999 WL 96920, at *4 (internal quotation marks omitted).

Suppose a claimant began a prescription to treat an underlying disease, and within a few weeks of starting the medication, began to feel chronically fatigued. The claimant was not fatigued before starting the medication, and he had no impairments that would normally be expected to cause fatigue.  Although the claimant never brought this symptom to the attention of his physicians, he did testify before an ALJ that he began feeling chronically fatigued after starting the medication.  Even without any corroborating "objective medical evidence," this testimony would certainly, raise enough of a question about the existence and extent of side effects that the ALJ should address it in his decision.[3]

But that is not the situation here.  Although Plaintiff did complain of fatigue and tiredness, he attributed these symptoms to his diabetes, kidney disease, and cardiomyopathy. (ECF No. 10, PageID.1255; *see also* ECF No. 8, PageID.49, 70,

---

[3] Indeed, 20 C.F.R. §§ 404.1529(c)(2), 416.929(c)(2) would prohibit the ALJ from ignoring this testimony simply because the record lacked corroborating medical evidence.

74).  And while the ALJ may have discounted Plaintiff's fatigue, he apparently credited Plaintiff's testimony that his kidney disease, diabetes, and cardiac issues would have been the causes of any fatigue he experienced.  (*See* ECF No. 8, PageID.49).  And that is not surprising since the ALJ asked Plaintiff at one of the hearings whether he had any "side effects" from his medications, and Plaintiff only mentioned that he had "little pains in the back" and "burning" urine.  (*Id.* at PageID.72).  Moreover, Plaintiff does not cite any evidence—either from his testimony or the medical record—indicating that the onset of his fatigue coincided with his use of any particular medication.  (ECF No. 10, PageID.1257–58).  In fact, he does not even provide a source to support his proposition that "many" of his medications "are known" to cause fatigue.  (*Id.*)

To summarize: the ALJ asked Plaintiff whether his medications caused any side effects and Plaintiff failed to mention that they caused fatigue, and on appeal, Plaintiff does not identify any evidence in the record that would fill this gap in his testimony.  Therefore, there was no "indication" that Plaintiff experienced these side effects and the ALJ did not err by declining to discuss these possible side effects in his decision.

Accordingly, I suggest that the ALJ's RFC finding is supported by substantial evidence.

### 2.    Whether the VE's Testimony Was Consistent with the DOT

Alternatively, Plaintiff argues that the ALJ did not rely on substantial evidence when finding that Plaintiff could perform his past work as an office equipment repairer because he failed to resolve a conflict between the VE's testimony and the DOT. Specifically, Plaintiff argues that although the ALJ's hypothetical provided that he must "avoid pulmonary irritants," the VE found that Plaintiff could work as an office equipment repairer even though this position could expose him to irritants like toner and soldering fumes.

At step four of the sequential analysis, the Commissioner carries the burden of proving that a claimant "can meet the demands" of his or her prior work "either as the claimant actually performed it or as" the job is "generally performed in the national economy." *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 238 (6th Cir. 2002); 20 C.F.R. § 404.1560(b)(2) (2022). And, if the ALJ presents a hypothetical that "accurately portrays" the claimant's functional abilities to the VE, then the ALJ can rely on a VE's testimony that the claimant can perform his past work. *See Varley v. Sec'y of Health & Hum. Servs.*, 820 F.2d 777, 779 (6th Cir. 1987); *see also Lee v. Comm'r of Soc. Sec.*, 529 F. App'x 706, 715 (6th Cir. 2013).

A VE's testimony "generally should be consistent with the occupational information supplied by the DOT." SSR 00-4p, 2000 WL 1898704, at *2 (Dec. 4, 2000). But VEs are not bound by the DOT—the DOT's descriptions of occupations "are merely advisory. . . ." *Wright v. Massaneri*, 321 F.3d 611, 616 (6th Cir. 2003);

*see also Warf v. Shalala*, 844 F. Supp. 285, 289 (W.D. Va. 1994).

Accordingly, where a VE's testimony conflicts with the DOT, neither the DOT nor the testimony "automatically 'trumps'" the other—it is up to the ALJ to resolve this conflict. SSR 00-4p, 2000 WL 1898704, at *2. The ALJ has an affirmative duty to ask the VE whether his or her testimony conflicts with the DOT. *Id.* at *4. If the VE's testimony "appears to conflict with the DOT," then the ALJ must "obtain a reasonable explanation for the apparent conflict" before relying on the VE's testimony. *Id.* In the Sixth Circuit, only conflicts which are identified by the VE are "apparent"—the ALJ has no independent duty to inspect the DOT for possible conflicts. *Martin v. Comm'r of Soc. Sec.*, 170 F. App'x 369, 374; *see Lindsley v. Comm'r of Soc. Sec.*, 560 F.3d 601, 606 (6th Cir. 2009).[4] A VE's belief, based on his or her "experience in job placement or career counseling," that the DOT does not accurately describe a particular job's requirements, constitutes a "reasonable explanation." SSR 00-4p, 2000 WL 1898704, at *2.

Here, Plaintiff first argues that the VE's conclusion that Plaintiff could

---

[4] This differs from the approach taken in many other circuits which hold that all discrepancies between a VE's testimony and the DOT are "apparent." *Washington v. Comm'r of Soc. Sec.*, 906 F.3d 1353, 1362–65 (11th Cir. 2018) (recognizing a split between the Sixth Circuit and the Fourth, Seventh, Eighth, Tenth, and Eleventh Circuits). In these circuits, ALJs must independently review the DOT and resolve any conflicts, including that are including those that were not acknowledged by the VE. *See, e.g.*, *Thomas v. Berryhill*, 916 F.3d 307, 313 (4th Cir. 2019); *Washington*, 906 F.3d at 1362–65.

perform his prior work as an office equipment repairer conflicted with the DOT because while the ALJ's hypothetical provided that Plaintiff must "avoid[] pulmonary irritants" such as "fumes, dust, gases, [or] noxious odors," the DOT lists soldering, welding, and oiling as typical job duties of office equipment repairers. *Compare* (ECF No. 8, PageID.100–01, 493), *with Dictionary of Occupational Titles* 633.281-018 (4th ed. 1991). And these duties, Plaintiff explains, usually expose workers to fumes and gases. (*See* ECF No. 10, PageID.1251–54). However, even if Plaintiff is correct that the VE's testimony conflicted with the DOT, there was no "apparent" conflict for the ALJ to resolve. *See Martin*, 170 F. App'x at 374. The ALJ asked the VE whether there were "any conflicts between" her "occupational evidence" and "the DOT," and the VE replied that only her responses concerning "time off task and workplace absences" conflicted with the DOT. (ECF No. 8, PageID.493–94). Because the VE did not identify this conflict, the ALJ did not err in relying on her testimony.[5]  *Martin*, 170 F. App'x at 374.

---

[5] Alternatively, I suggest that there was no actual conflict between the VE's testimony and the DOT. Although soldering, welding, and oiling are activities that one would typically expect to involve exposure to fumes and gases, the DOT clarifies that office equipment repairers are not exposed to "conditions that affect the respiratory system" such as "fumes, noxious odors, dusts, mists, [or] gases . . . ." *See Dictionary of Occupational Titles, supra*, at 633.281-018; POMS DI § 25001.001(A)(4). I suggest that this specific provision controls over any inferences the Court might draw from the DOT's description of the position's job duties. *See generally RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645–46 (2012). At best, Plaintiff demonstrates that the DOT is internally inconsistent, but if the DOT does not take a consistent position on whether office equipment repairers are exposed to pulmonary irritants, then there is nothing for the VE to have contradicted. *See Socha v. Saul*, No. 2:18-cv-10307, 2021 WL 1422887, at *6 (D.N.J.

Plaintiff then argues that the ALJ failed to resolve a conflict with the DOT by relying on the VE's testimony that Plaintiff could work as an office equipment repairer, while avoiding pulmonary irritants, even though this job could expose him to airborne toner which he could inhale.  (ECF No. 10, PageID.1251–54).  But the DOT itself never mentions toner—it only mentions gasses from oil, soldering, and welding.  *Dictionary of Occupational Titles, supra*, at 633.281-018.  And "[w]here the DOT is silent, 'a VE's testimony filling in the gaps does not raise a conflict.'" *Lacey v. Comm'r of Soc. Sec.*, No. 16-14363, 2018 WL 2181097, at *10 (E.D. Mich. Feb. 15, 2018); *see also Socha*, 2021 WL 1422887, at *6.  Indeed, only Plaintiff and the VE acknowledged that work as an office equipment repairer could expose him to airborne toner.  (ECF No. 8, PageID.97, 101).

What Plaintiff likely means to argue is that the VE's conclusion that Plaintiff could work as an office equipment repairer while avoiding pulmonary irritants is inconsistent with her acknowledgement that Plaintiff could be exposed to toner while working as an equipment repairer.  Thus, her testimony is not supported by substantial evidence.  However, the VE addressed this inconsistency by testifying that Plaintiff could avoid any exposure to toner by wearing a mask.[6]  (*Id.*)

---

Apr. 15, 2021); *Mitton v. Colvin*, No. 17-7399, 2015 WL 8780537 at *11 (D.N.J. Dec. 15, 2015).

[6] The Commissioner attempts to circumvent this issue by arguing that when the VE acknowledged the possibility that Plaintiff could be exposed to toner, she was only referring to the job as it was performed by Plaintiff, not as it is generally performed in the

Plaintiff asserts that simply stating that Plaintiff could avoid exposure to airborne toner by wearing a mask "cannot be deemed sufficient to resolve the conflict . . . ." (ECF No. 10, PageID.1252–54).  But he does not clearly explain why this was inadequate, arguing only that the DOT "fails to take into consideration" the effect of wearing a mask on exposure to environmental irritants.  (*Id.* at PageID.1254).  But VEs need not rely on the DOT when proffering vocational evidence, especially where the DOT is silent on a particular issue.  *See Wright*, 321 F.3d at 616 (explaining that the DOT is "merely advisory"); *Lacey*, 2018 WL 2181097, at *10.

And I suggest that the VE's testimony constituted substantial evidence.  To start, an ALJ may reasonably rely on a VE's testimony, even if the VE provides no support for her opinion.  *See Biestek v. Berryhill*, 139 S. Ct. 1148, 1155 (2019).  That is particularly true where, as here, the VE "has top-of-the-line credentials" and "nothing in the record conflicts" with her testimony.  *Id.*; *see also Hyde v. Barnhart*, 375 F. Supp. 2d 568, 572 (E.D. Mich. Mar. 2, 2005) (citing *Varley v. Sec'y of Health & Human Servs.*, 820 F.2d 777, 779 (6th Cir.1987)).  Indeed, the VE here had over

---

national economy.  (ECF No. 13, PageID.1271).  While it is true that Plaintiff's testimony regarding his experience in this job likely prompted the VE to discuss exposure to toner, she appears to have conceded that office equipment repairers are exposed to toner when performing the job both as it is generally performed and as Plaintiff performed the job in the past.  (*See* ECF No. 8, PageID.97, 101).  Indeed, she testified that wearing a mask would allow Plaintiff to avoid exposure to toner "as [the job] was performed [by Plaintiff] and as it is generally performed . . . ."  (*Id.* at PageID.101).

forty-five years of relevant experience, a master's degree in rehabilitation counseling from the University of Michigan, and various certifications. (ECF No. 8, PageID.491). Not only was the VE credible, but her assertion that Plaintiff could avoid exposure to toner by wearing a mask (such as an N95 or a surgical mask), appears reasonable on its face, and Plaintiff identifies nothing in the record that would cast this testimony into doubt. *See Pelfrey v. Comm'r of Soc. Sec.*, No. 1.05cv605, 2010 WL 909134, at *15 (S.D. Ohio Mar. 10, 2010) ("Here, the VE's testimony was supported by her own personal observation of the jobs she identified and common sense. No more was required.").

Of course, the ALJ may only rely on VE testimony regarding vocational—rather than medical—factors. *Baker v. Comm'r of Soc. Sec.*, No. 95-1510, 1996 WL 28965, at *2 (6th Cir. Jan. 24, 1996) (citing *Cook v. Heckler*, 739 F.2d 396, 399 (6th Cir. 1984)). Under the regulations, the ALJ bears the responsibility of determining the Claimant's functional capacity: that is "the most" a claimant "can do despite" his or her "limitations." 20 C.F.R. §§ 416.945(a)(1), 416.946(c); *see also Miller v. Colvin*, 784 F.3d 472, 479 (8th Cir. 2015). On the other hand, a VE may advise the ALJ on "the physical and mental demands of a claimant's past relevant work . . . ." 20 C.F.R. §§ 404.1560(b), 416.960(b). But here, the VE's testimony related to vocational consideration, rather than a medical consideration. The VE did not testify about Plaintiff's tolerance for pulmonary irritants; she testified about Plaintiff's

exposure to irritants. Just as a VE may properly testify about the presence of an environmental hazard, a VE may also testify about the availability and efficacy of personal protective equipment which mitigate a claimant's exposure to environmental hazards.[7]

Apart from the VE's testimony regarding the efficacy of wearing a mask, I suggest that the VE properly testified that the use of a mask would not prevent Plaintiff from performing his prior work. To determine whether a claimant can perform his or her past work, a VE should not assume that an employer will make a "reasonable accommodation," as required by the ADA, for the claimant—the VE can only consider whether the claimant can perform his or her past work as the claimant actually performed it or as the work is generally performed in the national economy. *Lazar v. Comm'r of Soc. Sec.*, No. 1:21-cv-00972, 2022 WL 4667145, at *11–17 (E.D. Cal. Sept. 30, 2022) (citing *Cleveland v. Pol'y Mgmt. Sys. Corp.*, 526 U.S. 795, 803 (1999)).

However, the VE can assume that employers will allow "accommodations that relate to larger vocational trends already prevalent in the market." *Unger v. Comm'r*

---

[7] The ALJ did not find that Plaintiff's sleep apnea prevented him from wearing a mask, and Plaintiff does not argue that the ALJ should have made such a finding. *See Sabbota v. Comm'r of Soc. Sec.*, No. 17-12477, 2018 WL 3626150 at *3 (E.D. Mich. July 5, 2018) (citing *McPherson*, 125 F.3d 995–96 ("'[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived."), *report & recommendation adopted by* 2018 WL 3626150 (E.D. Mich. July 30, 2018).

*of Soc. Sec.*, No. 4:18-cv-11200, 2019 WL 4891209, at *16 (E.D. Mich. Apr. 12, 2019).   That is because these types of "accommodations" are not really accommodations at all.   An accommodation is a change "in the way things are customarily done" in the work environment to include disabled individuals who otherwise could not perform a full range of job duties.   *Harris v. Colvin*, No. 3:12CV302, 2013 WL 4517866, at *3 (N.D. Ohio Aug. 21, 2013).   *See generally Jefries v. Gaylord Entm't*, Nos. 10-0691, 10-2418, 2013 WL 1316382, at *7 (D. Md. Mar. 27, 2013).   But if an accommodative measure is already prevalent in the market, then an employer does not provide any "special treatment" to an employee who takes advantage of these measures.   *Harris*, 2013 WL 4517866, at *4.   Simply put, a VE who describes an "accommodation" that is prevalent throughout an industry is merely describing how an occupation is "generally performed" in the national economy.   *See Unger*, 2019 WL 4891209, at *16.

That is exactly what the VE did here.   She testified that Plaintiff could avoid exposure to toner by wearing a mask and then explained that wearing a mask would not preclude Plaintiff from performing his past work as it is "generally performed" in the national economy.   (ECF No. 8, PageID.101).   That conclusion should come as no surprise—Plaintiff would only need to wear a mask while performing discrete duties such as soldering and replacing toner, and it is difficult to see how wearing a mask would inhibit his ability to perform his job.   Moreover, the ALJ issued his

decision over a year after the beginning of the COVID-19 pandemic, and since that time, mask wearing has become ubiquitous and generally accepted.

Accordingly, I suggest that the VE's testimony was both internally consistent and consistent with the DOT.  Thus, because the ALJ provided the VE with an accurate hypothetical, he relied on substantial evidence in finding that Plaintiff could perform his prior work as an office equipment repairer while avoiding any exposure to pulmonary irritants.

### H.    Conclusion

For these reasons, I conclude that substantial evidence supports the ALJ's decision.  Consequently, I recommend **DENYING** Plaintiff's Motion, (ECF No. 10), **GRANTING** the Commissioner's Motion (ECF No. 13), and affirming the decision.

## III.   <u>REVIEW</u>

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations.  A party may respond to another party's objections within 14 days after being served with a copy." Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1).  Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir.

1981).  The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation.  *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Dakroub v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).  Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains.  Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity.  Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc.  If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date:  January 3, 2023                                S/PATRICIA T. MORRIS
                                                       Patricia T. Morris
                                                       United States Magistrate Judge